## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------- X

Jamaal Lloyd, individually and on behalf of
all others similarly situated, and on behalf of
the W BBQ Holdings, Inc. Employee Stock
Ownership Plan,

               Plaintiff,

     v.

Argent Trust Company, Herbert Wetanson,
Gregor Wetanson, and Stuart Wetanson,

               Defendants.

-------------------------------------- X

Case No. _____

**CLASS ACTION COMPLAINT**

Plaintiff Jamaal Lloyd ("Plaintiff"), by and through his attorneys, on behalf of himself, all others similarly situated, and the W BBQ Holdings, Inc. Employee Stock Ownership Plan, states and alleges as follows:

### I.      <u>NATURE OF ACTION</u>

1.     This is a civil enforcement action brought pursuant to Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(2) and (a)(3). Plaintiff brings this action on behalf of the W BBQ Holdings, Inc. Employee Stock Ownership Plan ("WBBQ ESOP," "the ESOP," or "the Plan") and the class of participants and beneficiaries of the ESOP described below.

2.     The WBBQ ESOP is an ERISA-protected retirement plan whereby the individual retirement accounts of current and former employees are invested entirely in the stock of W BBQ Holdings, Inc. ("WBBQ" or the "Company"), a regional food chain in the New York City area that focuses on low-cost barbeque and beverages.

3.     In summary, Plaintiff alleges that the ESOP trustee, Argent Trust Company ("Argent"), and the Company's controlling managers and shareholders, Herbert Wetanson, Gregor Wetanson, and Stuart Wetanson (the "Seller Defendants"), caused the Plan to engage in prohibited transactions and breached their fiduciary duties in connection with the sale of the Company to the ESOP for an inflated purchase price that far exceeded its fair market value, and by arranging for continued payments to the Seller Defendants in connection with the sale.[1]

4.     Pursuant to the terms of the Transaction, the ESOP acquired 400,000 shares of WBBQ common stock from the Seller Defendants in or around July 2016 (80% of the shares then outstanding) for an aggregate price of $98,887,309. This amount was over six million dollars higher than the purchase price that was originally negotiated ($92,000,000) for the same number of shares, and vastly exceeded the fair market value of those shares.

5.     According to financial statements filed by the ESOP with the Department of Labor, the value of the acquired shares was only $28,880,000.00 as of year-end 2016 – less than 30% of what the ESOP paid to the Seller Defendants. Subsequent financial statements reported even lower values: $28,880,000 as of year-end 2017, $18,800,000 as of year-end 2019, and $11,246,418 as of December 31, 2020 (the last year for which reported data is available).  At no point was the value of the Company's shares worth what the ESOP paid for them.

6.     A proper evaluation of the Transaction would have accounted for several important risk factors that limited the value of the Company at the time of sale, including increasing labor costs and rents, geographic concentration in the high-cost New York City market, and the

---

[1] The employee-participants did not negotiate the Transaction price or any of the terms of the Transaction. In fact, the employee-participants who purchased the WBBQ stock had ***no input*** on the terms negotiated and agreed to by Argent and the Seller Defendants. Nor did the employees consent to the terms of the Transaction.

Company's low margins and its limited ability to pass along costs to customers. Moreover, a proper evaluation also would have accounted for the manner in which the Transaction was structured, such that (i) the Seller Defendants would continue to retain significant control over the Company; (ii) the Seller Defendants had the ability to obtain additional shares that had not yet been issued and thereby dilute the value of existing shares; (iii) almost the entire purchase price was financed through loans which were either guaranteed by the Company (in the case of a $73,887,309 loan from the Seller Defendants to the ESOP) or issued directly by the Company to the ESOP (in the case of a separate $20,200,000 loan); and (iv) the Company was financially burdened with the obligation to make contributions to the ESOP sufficient to make the necessary loan payments, including principal and interest payments to the Seller Defendants.

7.      Argent and the Seller Defendants did not give adequate consideration to these and other factors in determining the sale price for the Company. To the contrary, the Seller Defendants were focused on promoting the Company's value for their own financial benefit, and Argent did not properly account for their conflicts of interest and failed to conduct a rigorous independent examination of the Transaction and the price paid by the ESOP.

8.      The WBBQ ESOP Transaction has come under scrutiny by the Department of Labor ("DOL"), which issued a subpoena to the Seller Defendants' investment advisory firm (CSG Partners, LLC) in connection with the Transaction and three other ESOP transactions. In all four transactions that are the subject of the subpoena, Argent was retained to review the sale and offered an opinion approving the sale.

9.      As the ESOP Trustee, Argent had a fiduciary duty under ERISA to act prudently and in the sole interest of Plan participants, *see* 29 U.S.C. § 1104(a)(1)(A)-(B), and also had a duty to ensure that the ESOP did not engage in prohibited transactions, *see* 29 U.S.C. § 1106. The Seller

Defendants similarly had a fiduciary duty to prudently appoint and monitor the Trustee in the sole interest of participants, and to refrain from engaging in prohibited transactions with the ESOP.

10.    Based on the foregoing allegations and the other allegations set forth below, Defendants have breached their fiduciary duties and caused the Plan to engage in prohibited transactions with the Seller Defendants, resulting in tens of millions of dollars in losses to the Plan and its participants and beneficiaries. Plaintiff brings this action pursuant to ERISA §§ 409(a) and 502(a)(2)-(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), to restore these losses to the Plan, disgorge the monies that the Seller Defendants unlawfully obtained in connection with the Transaction, and obtain appropriate equitable relief and other available relief.

## II.    JURISDICTION AND VENUE

11.    **Subject Matter Jurisdiction**. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(a), 29 U.S.C. § 1132(a).

12.    **Personal Jurisdiction.** This Court has personal jurisdiction over Defendants because they transact business in, and have significant contacts with, this district.

13.    **Venue**. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), for at least the following reasons:

      a.    Defendants' alleged breaches of fiduciary duty took place in this district at the Company's offices located in New York, New York;

      b.    Defendants Herbert and Stuart Wetanson reside in this district; and

      c.    Other Defendants may be found in this district, as WBBQ transacts business and employs individuals in New York, New York, and the surrounding area.

## III.    PARTIES

### A.    Plaintiff

14.    Plaintiff Jamaal Lloyd is a former employee of the Company and a current participant in the ESOP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). Plaintiff worked

for WBBQ from 2013 to 2020, and he was a Plan participant at the time of the Transaction. At the time he left the Company, Plaintiff Lloyd was 60% vested in the WBBQ shares allocated to his ESOP account, and he has suffered a financial injury as a result of Defendants' unlawful conduct described herein.

     **B.**     **<u>Defendants</u>**

15.     **Defendants Argent Trust Company** is located in Atlanta, GA and has offices across the United States. Argent is the Trustee of the WBBQ ESOP and holds, manages, and controls the ESOP's assets.

16.     Argent is a named fiduciary of the Plan within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a).

17.     Argent is also a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because it exercises discretionary authority or discretionary control respecting management of the ESOP, exercises authority and control respecting management or disposition of the ESOP's assets, and/or has discretionary authority or discretionary responsibility in the administration of the ESOP.

18.     Argent, on behalf of the ESOP, approved the ESOP's purchase of WBBQ stock from the Seller Defendants for $98,887,309.00, which was greater than fair market value. Argent, on behalf of the ESOP, also approved all Transaction terms, including the ESOP borrowing over $94 million to complete the Transaction, and the Company's guarantee of the borrowed amount from the Seller Defendants.

19.     **Defendant Herbert Wetanson:** Herb Wetanson is the Company's founder and President, and prior to the Transaction, was a co-owner of the Company who sold his shares to the ESOP.

20.     On information and belief, at the time of the Transaction, Defendant Herb Wetanson was, and continues to be, a member of the Board of Directors of WBBQ.

21.     As a member of the Board of Directors, Defendant Herb Wetanson appointed Argent as Trustee of the ESOP.

22.     Defendant Herb Wetanson is a fiduciary to the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

23.     Defendant Herb Wetanson is also a "party in interest" to the ESOP as defined in ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

24.     **Defendant Gregor Wetanson:** Gregor Wetanson is Herb Wetanson's son, and prior to the Transaction, was a co-owner of the Company who sold his shares to the ESOP.

25.     On information and belief, Gregor Wetanson was at the time of the Transaction, and remains, the Company's Chief Executive Officer.

26.     On information and belief, at the time of the Transaction, Defendant Gregor Wetanson was, and continues to be, a member of the Board of Directors of WBBQ.

27.     Defendant Gregor Wetanson was also the predecessor Plan trustee to Argent.

28.     As a member of the Board of Directors, Defendant Gregor Wetanson appointed Argent as Trustee of the ESOP.

29.     Defendant Gregor Wetanson is a fiduciary to the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

30.     Defendant Gregor Wetanson is also a "party in interest" to the ESOP as defined in ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

31.     **Defendant Stuart Wetanson:** Stuart Wetanson is Gregor Wetanson's son, and prior to the Transaction, was a co-owner of the Company who sold his shares to the ESOP.

32.    On information and belief, Stuart Wetanson was at the time of the Transaction, and remains, a manager of the Company.

33.    On information and belief, at the time of the Transaction, Defendant Stuart Wetanson was, and continues to be, a member of the Board of Directors of WBBQ,

34.    As a member of the Board of Directors, Defendant Stuart Wetanson appointed Argent as Trustee of the ESOP.

35.    Defendant Stuart Wetanson is a fiduciary to the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

36.    Defendant Stuart Wetanson is also a "party in interest" to the ESOP as defined in ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

37.    Defendants Herb, Gregor, and Stuart Wetanson are collectively referred to herein as the **Seller Defendants**.

## IV.    FACTUAL ALLEGATIONS

### A.    The Company

38.    WBBQ is a chain of restaurants based in New York City that was founded by Herb Wetanson over 30 years ago.

39.    Prior to the Transaction, the Company was owned by the Wetanson family.

40.    WBBQ's primary restaurant line operates as Dallas BBQ.

41.    Dallas BBQ markets itself as a low-priced provider of barbeque and frozen alcoholic beverages.

42.    WBBQ has restaurant locations in Times Square; Jamaica, Queens; and Co-op City; among other places in the boroughs of New York City.

43.    The Company reported 300 employees to the Small Business Administration as of March 10, 2021. The Company reported 500 employees the year earlier.

**B.**      **The Sale of the Company to the WBBQ ESOP**

      **1.**      **The Company Created a Willing Buyer through the ESOP**

44.      On January 1, 2015, the Company established the W BBQ Holdings, Inc. Profit Sharing Plan, which is a defined contribution benefit plan established for the benefit of Company employees.

45.      On October 13, 2016, the Company filed a Form 5500 with the DOL disclosing $6,191,648 of employer contributions for the year 2015. On June 29, 2017, the Company filed an amended Form 5500 for 2015 disclosing only $4,811,600 of employer contributions for the year 2015 without explaining the cause of amendment or conflicting contribution disclosures.

46.      The contributions that the Company made to the W BBQ Holdings, Inc. Profit Sharing Plan in 2015 were not invested in any assets that year.

47.      To effectuate their planned sale of WBBQ, the Seller Defendants established the ESOP by amending and restating the W BBQ Holdings, Inc. Profit Sharing Plan on January 1, 2016 to become the W BBQ Holding, Inc. Employee Stock Ownership Plan.

48.      The ESOP is a pension plan within the meaning of ERISA § 3(2), 29 U.S.C. § 1002(2), and is subject to ERISA pursuant to ERISA § 4(a)(1), 29 U.S.C. § 1003(a)(1).

49.      The ESOP is an individual account plan, or defined contribution plan, under which a separate individual account has been established for each participant. Employees of WBBQ participate in the ESOP.

50.      As an ERISA-protected ESOP, employer contributions made on behalf of employees are invested in the employer's stock. ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6); *see also* 29 C.F.R. § 2550.407d–6 (definition of the term "employee stock ownership plan").

51.      The Plan is identified in Department of Labor filings as a "Leveraged ESOP," and it is designed to invest in the employer securities of WBBQ.

52.     The employer contributions, invested in employer stock, are part of employee compensation and comprise an important part of employee retirement savings.

53.     The ESOP'S 2020 Form 5500 states that it has 1,459 participants.

>    **2.    The Seller Defendants Engaged Professionals to Facilitate the ESOP Transaction that have Come Under Legal Scrutiny**

54.     Prior to the Transaction, the Seller Defendants engaged CSG Partners, LLC, an investment advisory firm that assists owners of closely-held companies monetize their equity. CSG Partners, LLC was later the target of a subpoena enforcement action initiated by the DOL because of its involvement in four ESOP transactions that the DOL is investigating, which include the WBBQ ESOP transaction. *See Walsh v. CSG Partners, LLC*, 544 F. Supp. 3d 389, 390 (S.D.N.Y. 2021).

55.     On information and belief, CSG Partners, LLC recommended that the Seller Defendants hire Argent to be the ESOP Trustee.

56.     On November 5, 2015, the Company, acting through the Board of Directors, engaged Argent to serve as trustee for the ESOP transaction. This relationship required Argent to (among other things) perform due diligence into WBBQ's business, negotiate and approve an appropriate sales price for WBBQ with the Seller Defendants, and ensure that the ESOP paid no more than fair market value ("FMV") for the Company.

57.     Argent has been the subject of significant litigation stemming from its conduct as an ESOP trustee, and was the trustee of the four ESOP transactions at issue in the DOL's CSG subpoena.

58.     Argent engaged Stout Risius Ross, LLC ("SRR"), a valuation advisor, to assist it in valuing WBBQ. Investment advisory firms that represent sellers in ESOP transactions have actively sought the involvement of SRR, and their analyst Aziz El-Tahch who worked on the

Transaction, in the trustee valuation process. Both SRR and Aziz El-Tahch have been the subject of litigation because ESOP sale price valuations they performed in other cases allegedly exceeded FMV.

### 3.    The Transaction Resulted in a Substantial Payout for Seller Defendants and Burdensome Debt for the ESOP

59.    According to a restated Form 5500 filed with the Department of Labor, the ESOP ultimately purchased 400,000 shares of the Company's stock on July 29, 2016 for a total price of $98,887,309.00, representing an average per share price of $247.22.

60.    The 400,000 shares that were purchased (with Argent's approval) represented 80% of the Company's shares outstanding.   Those shares consisted exclusively of WBBQ common stock.

61.    To finance the purchase of shares, the ESOP entered into two separate loans totaling $94,087,309 of debt.

62.    The first loan agreement was an inside loan from the Company to the ESOP (the "Company Loan"), which provided the ESOP $20,200,000 that it used to purchase Company stock. The Company Loan had a maturity date of 12/31/2035 and charged an annual interest rate equal to the Long-term Applicable Federal Rate.

63.    The second loan was a loan from the Seller Defendants to the ESOP (the "Seller Notes"). The Seller Notes required the ESOP to repay the Seller Defendants $73,887,309 by 12/31/2035. The Seller Notes carried a higher interest rate than the Company Loan.[2]

---

[2] On December 2, 2016, Gregor Wetanson organized Liquid Subsidiary, LLC in New York. On information and belief, Liquid Subsidiary, LLC is owned by one or all of the Seller Defendants. On December 21, 2017, the Seller Notes were assumed and refinanced by the Company in exchange for an internal loan from the ESOP as well as a reciprocal loan due to Liquid Subsidiary, LLC, which received the remaining balance of the Seller Notes.

C.    **The Transaction Was Not Fair and Not in the Interest of Plan Participants**

1.    **The ESOP Paid More than Fair Market Value for the Company's Stock**

64.    The purchase price that the ESOP paid ($98,887,309.00) far exceeded the fair market value of the purchased shares.

65.    According to the ESOP's 2016 financial statements filed with the DOL, the reported value of the acquired WBBQ stock on December 31, 2016 – just five months after the Transaction – was $72.20 per share, or $28,880,000.00 million in the aggregate, which equals 29.2% of the value that the ESOP paid for WBBQ stock.

66.    The Company's stock price continued to decline after the Transaction. As of December 31, 2017, the value of WBBQ stock as reported to the DOL was $47.00 per share, or $18,800,000 in the aggregate. As of December 31, 2019, the reported value of WBBQ stock was $28.12 per share, or $11,246,418.00 in the aggregate.[3] The last disclosure to the DOL reported the value of WBBQ stock as $18.52 per share as of December 31, 2020, or $7,406,449.00 in the aggregate.

67.    Although the WBBQ ESOP ultimately paid $98,887,309.00 for 80% of the Company's shares, the Seller Defendants and Argent had originally agreed that the ESOP would purchase those 400,000 shares of the Company for an average purchase price of $230 per share, or $92,000,000.00 in the aggregate. As a result of the amended purchase price, the Company's total valuation for purposes of sale was increased by $8.6 million without securing the ESOP additional consideration. This exacerbated the amount the ESOP overpaid.

---

[3] By December 31, 2019, the principal that had been paid down on the underlying loan transactions exceeded the reported value of the Company.

68.     The structure of the Transaction reflects that the amount of overpayment was particularly acute with respect to certain shares. Even though only one class of equity was purchased,[4] the ESOP paid three different prices for Company's common stock: $185.84 per share for 108,696 of the 400,000 shares; $270.77 per share for 265,890 of the 400,000 shares; and $263.17 per share for 25,414 of the 400,000 shares. It was not fair or reasonable to pay $270.77 for shares that were otherwise deemed to only be worth $185.84 (according to Argent and the Seller Defendants) because the ESOP did not receive additional consideration for the more expensive shares. Had the ESOP paid $185.84 for all 400,000 shares it purchased, it would have paid $24.6 million less for the Company's stock.

### 2.     The Appraisal that Was Used to Justify the Inflated Purchase Price Failed to Properly Account for Several Material Considerations

69.     The valuation process undertaken by Argent with SRR's assistance was flawed. The stock appraisal upon which Argent relied was based on unrealistic and inflated projections of WBBQ's future cash flows and earnings, excluded material facts relevant to the valuation, and ignored non-monetary benefits that the Seller Defendants negotiated for themselves as part of the Transaction.

70.     Argent's selection of SRR (including Aziz El-Tahch) and reliance on the SRR valuation was inconsistent with a prudent and loyal fiduciary process because SRR had acted as the valuation advisor for numerous ESOP transactions involving CSG, which resulted in a conflict of interest between the valuation advisor and the ESOP participants.  Such conflicts are inconsistent with basic fiduciary standards and DOL requirements for trustees such as Argent.

---

[4] All shares sold to the ESOP consisted of common stock with the same rights and privileges, and derived their value from the same underlying assets and liabilities.

71.    These unrealistic and inflated projections of WBBQ's future cash flows and earnings were influenced by the Seller Defendants, who stood to (and did) personally profit from any increased value in the stock price paid to them by the ESOP in the Transaction. The financial and business information provided by the Seller Defendants to Argent and SRR was subject to conflicts of interest that were not properly accounted for as part of the valuation process.

a.    The Stock Appraisal Failed to Adequately Discount for WBBQ's Rising Input Costs and Geographic Concentration in New York

72.    At the time of the Transaction, the Company was facing substantial headwinds that Argent should have, but failed to, adequately consider when approving the $98.9 million price tag. Two main sources of these headwinds were rapidly rising costs and the Company's geographic concentration.

73.    According to statements by Stuart Wetanson, the prices that the Company charged to customers in the 2010s were similar to what they were in the 1980s. As a provider of low-price food, the Company had little cushion to absorb rising costs without having to modify its business model. In the face of rising costs for labor and rent (which were increasing significantly at the time of the Transaction), the Company would either lose profitability or sacrifice the price differentiation which facilitated its sales.

74.    On April 4, 2016, then Governor Andrew Cuomo executed legislation that would cause the minimum wage for New York City workers to raise to $15 per hour, a nearly 50% increase from pre-legislation minimums.

75.    The first increase occurred effective December 31, 2016, and subsequent increases went into effect during calendar year 2017 and 2018.

76.    Even before the strain from wage increases were due to hit the Company's bottom line, high rental costs were affecting restaurant profitability.

77.    At the time of the Transaction, New York City restaurants were experiencing rents that were more than double that found in other markets.

78.    According to retail research from the commercial real estate firm Cushman & Wakefield, restaurant-space rents in 2016 were running from $120 to $180 a square foot in Manhattan, compared to $60 to $80 in Los Angeles, and from $60 to $100 in San Francisco.

79.    Rising rents caused the Company's location on 72nd street, which had been operating since 1978, to close just a year and a half before the Transaction.

80.    The Company was uniquely affected by the cost increases being seen in New York because it was geographically limited to Manhattan and the other boroughs.

81.    Without geographic diversification, the Company's entire value was subject to risks idiosyncratic to New York City.

82.    The Company's lack of geographic diversification made its future growth less certain and riskier than a similar, diversified restaurant chain.

83.    The approved ESOP Transaction sale price failed to properly account for the Company's increasing costs, limited margins, lack of geographic diversity, and unique risk profile.

84.    Had Argent discounted the Seller Defendants' projections and SRR's stock valuation to adequately reflect these factors, it would not have approved the Transaction at the price it did.

           b.    <u>The Stock Appraisal Failed to Adequately Account for the Sellers' Continued Control over the Company and Their Ability to Procure Additional Shares for Themselves</u>

85.    The approved ESOP Transaction sale price also failed to fully account for the fact that the Seller Defendants retained control over the Company and secured warrants that gave them the right to obtain stock directly from the Company and dilute the value of existing shares.

86.     The price an investor is willing to pay for a company's equity is materially affected by the degree to which the investor's equity interest will give the investor control over the company.

87.     In connection with the ESOP Transaction, the Seller Defendants retained substantial control over the Company.

88.     The Plan Document permits the Company, acting through the Board of Directors, to appoint and remove members of an Investment Committee. The Plan Document further vests the Investment Committee with the power to vote Company shares held by the ESOP, despite the appointment of Argent as Trustee. The Sellers, as members of the Board, thus retained voting power for shares of Company stock.

89.     Even if Argent was vested with the sole power to vote the Company's shares held by the ESOP, the Company, acting through the Board of Directors, retains the right to remove and replace Argent as Trustee without cause.

90.     Thus, even though the ESOP purchased 80% of WBBQ's common stock, the Seller Defendants retained control over the Company, including control over voting rights in connection with the shares that were sold to the ESOP and supervisory power over Argent as the Trustee appointed by the Board.

91.     Non-controlling interests trade at a substantial discount (generally over 20%) relative to a controlling interest in a company.

92.     The price that the ESOP paid and that Argent approved should have been, but was not, adequately reduced to discount for lack of control, given that the ESOP did not actually obtain full operational control over WBBQ or control of the Board of Directors.

93.     In addition to the ongoing control that the Seller Defendants maintained with respect to existing shares, the Seller Defendants also secured, upon information and belief, "Warrants" that give them the right to acquire additional shares in the Company. Shares issued pursuant to a Warrant are issued directly by the Company, thereby diluting other shareholders' equity interest in the Company.

94.     On May 19, 2016, the Company's Articles of Incorporation were amended to authorize the issuance of 1,000,000 shares.

95.     At the time of the Transaction, only 500,000 shares of the Company's authorized shares were outstanding.

96.     If the full number of authorized shares were issued through the Warrants or other forms of synthetic equity, the ESOP's interest in the Company would drop to 40%.

97.     The price that the ESOP paid and that Argent approved failed to properly account for the potential dilutive effect of the Warrants that the Seller Defendants obtained.

### 3.     The Transaction Imposed Significant Ongoing Financial Burdens on the ESOP and the Company

98.     The Transaction was also problematic because it imposed significant ongoing financial burdens on the ESOP and the Company that was being purchased.

99.     As noted above, the Transaction was financed with two separate loan transactions: a loan from the Seller Defendants to the ESOP in the amount of $73,887,309 and a separate loan from the Company to the ESOP in the amount of $20,200,000. *See supra* at ¶¶ 62-63.  Due to the size of these loans and the inflated purchase price, the ESOP was underwater on the Transaction from the moment the Transaction was consummated.

100.     The Seller Notes carried a higher interest rate than the Company Loan at the time of the Transaction. This exacerbated the burden to the ESOP, as it paid a higher interest rate to the Seller Defendants than it should have.

101.     If anything, the loan from the Seller Defendants to the ESOP should have carried a substantially *lower* interest rate than the loan from the Company to the ESOP, because the Seller Notes were guaranteed by the Company.

102.     The Company's guarantee of the Seller Notes impaired WBBQ's value because the loan is classified as debt on WBBQ's balance sheet and is a charge to shareholders' common equity.

103.     WBBQ also assumed the risk of nonpayment in connection with the Company's loan to the ESOP.

104.     Additionally, under the terms of the Transaction, WBBQ is obligated to make contributions to the ESOP in an amount sufficient to cover both loan payments, resulting in a significant cash drain on the Company. These retirement contributions that the Company is required to make to service the ESOP's debt have significantly impaired WBBQ's cash flows and earnings after the Transaction, and ultimately its value.[5]

105.     This cash drain is magnified by the Company's obligation to buy any shares of its stock distributed to participant accounts that participants are entitled to sell.

106.     None of this was adequately accounted for by Argent in approving the Transaction.

---

[5] The retirement contributions made to employee individual accounts are an important part of WBBQ employee compensation under ERISA. *See* 26 U.S.C. § 404; 26 C.F.R. § 1.404(a)-1(b). Yet, to the extent that they are used to make interest payments, they result in no appreciable benefit to Plan participants and crowd out the Company's ability to offer other types of compensation to its employees.

### D.    Argent Improperly Approved the Transaction

107.    Consistent with its fiduciary obligations under ERISA, Argent was required to ensure that the ESOP did not pay more than fair market value for WBBQ stock taking into account all aspects of the Transaction. However, Argent failed to do so, and overlooked many important facts (as discussed above) that should have caused it to more critically examine the stock appraisal and the average purchase price of $247.22 per share.

108.    Argent also failed to adequately consider the related ESOP loan terms and Company contribution obligations, and their implications for the Transaction.

109.    Had Argent adequately considered all material facts, it would have recognized that (a) the purchase price was inflated, (b) it was not prudent and in ESOP participants' interest to complete the Transaction, and (c) the Transaction was designed to enrich the Seller Defendants rather than benefit Plan participants and their beneficiaries.

### E.    The Seller Defendants Failed to Exercise Appropriate Care and to Consider the Interests of Participants in Appointing and Retaining Argent as Trustee

110.    The Seller Defendants failed to prudently appoint Argent.  The Seller Defendants appointed Argent because they believed it would approve the Transaction, not because they believed it would conduct a thorough and complete review of the Transaction in participants' best interests.

111.    The Seller Defendants also failed to prudently monitor Argent and ensure that it complied with its ERISA fiduciary duties and properly evaluated the Transaction.  To the contrary, the Seller Defendants sought to convince Argent to approve the Transaction, even though they knew from their vantage point as Company insiders that the purchase price was inflated and the Transaction was not in participants' interests.

112.     Because the Seller Defendants were at the highest levels of Company management, each of them was involved in the preparation of financial projections and other information used in appraisals of WBBQ stock. This included involvement in the preparation of financial projections for WBBQ future cash flows and earnings that the Seller Defendants knew or had reason to know to be overly optimistic, and which formed the basis of the stock appraisal relied upon by Argent in determining the price paid by the ESOP.

113.     The Seller Defendants continue to be involved in the ESOP's financial statements after the Transaction. The ESOP's financial statements expressly state that WBBQ's "[m]anagement is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal controls relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error."

114.     The Seller Defendants were aware of all facts alleged herein because they were Company leaders and members of the Board of Directors who were privy to the relevant events and had access to all relevant information. At no point did they ever raise any red flags or issue any cautionary warnings relating to the Transaction, and since the Transaction was consummated, they have failed to take any remedial action or remove Argent as Trustee.

## F.     Seller Defendants Have Retained the Ill-Gotten Gains Received from the ESOP Transaction

115.     On information and belief, each of the Seller Defendants deposited their share of the proceeds from the Transaction in their personal account, and each such account continues to exist in the possession of the Seller Shareholders.

116.     Additionally, the Plan Document contemplated that some or all of the Seller Defendants would invest the proceeds of the Transaction in "qualified replacement property" pursuant to Section 1042 of the Internal Revenue Code ("I.R.C."), in order to avoid capital gains tax on the sale of their WBBQ stock to the ESOP. Under I.R.C. § 1042, the gains on the sale of stock to the ESOP are taxed when the qualified replacement property is sold, and capital gains taxes can be eliminated entirely if the qualified replacement property is held by the Seller Defendants until death. On information and belief, the Seller Defendants who invested the proceeds in qualified replacement property continue to hold such property to avoid the adverse tax consequences.

117.     Each Seller Defendant who sought deferral of capital gains pursuant to I.R.C. § 1042 was required to complete a signed Statement of Purchase that identified and declared the specific securities that represent the qualified replacement property that was purchased to avoid taxes on the receipt of proceeds from the ESOP Transaction. The Statement of Purchase for each Seller Defendant who elected I.R.C. § 1042 deferral would be filed with their tax return.

## V.     CLASS ALLEGATIONS

118.     Plaintiff brings this action derivatively on behalf of the Plan pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3).

119.     Plaintiff also brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of the following class:[6]

> All participants in the W BBQ Holdings, Inc. Employee Stock Ownership Plan on or after July 29, 2016 who vested in whole or in part under the terms of the ESOP, and those participants' beneficiaries, excluding Defendants and their immediate family members; any fiduciary of the ESOP; and any current or former officers or directors of WBBQ.

---

[6] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

120.     **Numerosity.** The Class is so numerous that joinder of all class members is impracticable. The ESOP currently has more than 1,400 participants.

121.     **Commonality.** This case presents numerous common questions of law and fact, including but not limited to:

a.     Whether Argent is an ERISA fiduciary, and the scope of its fiduciary duties;

b.     Whether the Seller Defendants are ERISA fiduciaries, and the scope of their fiduciary duties;

c.     Whether Argent breached its fiduciary duties under ERISA;

d.     Whether the Seller Defendants breached their fiduciary duties under ERISA;

e.     Whether the Seller Defendants are parties in interest as defined by ERISA;

f.     Whether the Transaction was a prohibited transaction under ERISA;

g.     Whether the ESOP paid fair market value for the purchased shares of WBBQ;

h.     Whether the post-sale loan payments to the Seller Defendants were prohibited transactions under ERISA;

i.     The amount of losses suffered by the ESOP as a result of the unlawful conduct alleged herein;

j.     The proper form of equitable and injunctive relief; and

k.     The extent to which any non-fiduciary Defendants are subject to equitable remedies and relief.

122.     **Typicality.** Plaintiff's claims are typical of the claims of other class members because (among other things): (a) Plaintiff was employed by WBBQ and was a participant in the ESOP; (b) Plaintiff was treated consistently with other ESOP participants; (c) Plaintiff suffered the same injuries as other ESOP participants on account of the ESOP's overpayment for WBBQ stock; and (d) Plaintiff seeks relief on behalf of the Plan as a whole rather than relief that is unique to himself.

123.     **Adequacy.** Plaintiff will fairly and adequately protect the interests of the class. Plaintiff's interests are aligned with the class he seeks to represent, and he is committed to the vigorous representation of the class. Plaintiff's undersigned counsel is experienced in ERISA litigation and other complex class action litigation. Plaintiff has no interests antagonistic to or in conflict with the interests of the class that would impair his ability to represent the class.

124.     **Rule 23(b)(1)(A).** Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications  that would establish incompatible standards of conduct for Defendants relating to the ESOP.

125.     **Rule 23(b)(1)(B).** Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual class members would, as a practical matter, be dispositive of the interests of other ESOP participants and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the class. Further, the relief granted by the Court, including any equitable relief, injunctive relief, or accounting of profits, may be dispositive of the interests of other class members

126.     **Rule 23(b)(2).** Additionally or alternatively, class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiff and the class as a whole.

127.     **Rule 23(b)(3)**. Additionally or alternatively, class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to all class members predominate over any questions affecting individual members of the class,  and because a class action is superior to other available methods for the fair and efficient adjudication of this action.

Common questions related to liability will necessarily predominate over any individual questions because Defendants' duties and obligations were uniform with respect to all ESOP participants and therefore all members of the class. Further, Plaintiff and all class members have been similarly harmed by the ESOP paying more than fair market value for WBBQ stock in the Transaction, and common questions as to remedies will also predominate over any individual issues (particularly since relief is sought on behalf of the Plan as a whole). Class members do not have an interest in pursuing separate actions against Defendants, as this action is brought on behalf of the Plan and the amount of any individual claims would be relatively small compared to the expense and burden of individual prosecution. Plaintiff is unaware of any similar claims brought against Defendants by any class members individually. Class certification will be efficient and eliminate the need for unduly duplicative litigation to remedy the unlawful conduct alleged herein. Management of this action as a class action will not present any likely difficulties and is in the best interest of the named parties, the class, and the Court.

## VI.   CAUSES OF ACTION

### Count I
### Breach of Fiduciary Duties Under ERISA §§ 404(a)(1)(A) and (B),
### 29 U.S.C. §§ 1104(a)(1)(A) and (B)
### (Against Argent)

128.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

129.    Argent was a fiduciary to the Plan by virtue of its appointment and role as the ESOP Trustee.

130.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires that a plan fiduciary act "for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan."

131.    ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), requires that a plan fiduciary act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

132.    In the context of a sale of a company/employer to an ESOP, the duties of loyalty under ERISA § 404(a)(1)(A) and prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to ensure that the ESOP and its participants pay no more than adequate consideration for the company's assets and the participants' accounts in the ESOP.

133.    Pursuant to ERISA § 3(18), adequate consideration for an asset for which there is no generally recognized market means the fair market value of the asset determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with DOL regulations.

134.    Argent was required to undertake appropriate and independent due diligence and an investigation of the fair market value of the WBBQ stock before approving the Transaction. Among other things, Argent was required to conduct a thorough and independent review of any "independent appraisal" (i.e., the stock appraisal) to make sure that reliance on that appraisal was reasonably justified under the circumstances of the Transaction; to investigate the reliability and reasonableness of the management projections for WBBQ's future revenue, earnings, and cash flow upon which the discounted cash flow method used in the appraisal was based; to make an honest, objective effort to read and understand the valuation reports and opinions, and question any uncertain methods and assumptions; to identify, question, and test the underlying financial data and assumptions; to verify that the conclusions are consistent with the data and analyses; and to avoid using SRR as the valuation advisor because it had done numerous previous ESOP deals

structured and implemented by the investment firm CSG, which stood to make more in fees the more the ESOP paid to the Seller Defendants.

135.    As alleged above, a prudent and loyal investigation of all the relevant terms, financial projections, and assumptions in connection with the Transaction would have revealed that the aggregate Transaction price of $98,887,309, reflecting an average price of $247.22 per share, was greater than the fair market value of the WBBQ stock at the time of the Transaction.

136.    A prudent and loyal investigation by Argent also would have revealed that it was imprudent to approve the debt structure of the Transaction.

137.    A prudent and loyal investigation by Argent would have further revealed that the Transaction terms, taken together, were not in the best interest of ESOP participants.

138.    By failing to act prudently and loyally in participants' best interests in connection with the Transaction, and by approving the Transaction and failing to restore the losses caused thereby, Argent breached its fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), and caused losses to the ESOP and the retirement accounts of ESOP participants.

139.    Argent is liable to restore these losses and for other appropriate relief under ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3), and ERISA § 409, 29 U.S.C. § 1109, as a result of these fiduciary breaches.

**Count II**
**Improper Fiduciary Appointment and Monitoring**
**in Violation of ERISA §§ 404(a)(1)(A) and (B),**
**29 U.S.C. §§ 1104(a)(1)(A) and (B)**
**(Against Seller Defendants)**

140.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

141.    The Plan Document provides that the Company, acting through the Board of Directors, appoints and has the power to remove the Trustee of the ESOP.

142.     As members of the Company's Board of Directors, the Seller Defendants appointed Argent as the ESOP Trustee.

143.     Following Argent's appointment, the Seller Defendants retained the power to remove Argent as the ESOP Trustee, but elected to preserve it in that role at all relevant times.

144.     Company board members who are responsible for the selection and retention of Plan fiduciaries are themselves fiduciaries with respect to the Plan, and are subject to ERISA's duties of loyalty and prudence with regard to the selection and retention of their appointed fiduciaries. *See* 29 C.F.R. § 2509.75-8 (D-4).

145.     The Seller Defendants breached their fiduciary duties in connection with the appointment of Argent as the ESOP Trustee. The Seller Defendants appointed Argent because they believed it would rubber stamp the Transaction, not because they believed doing so was in the in the interest of the ESOP and its participants and beneficiaries. A prudent investigation would have revealed other potential candidates who would have done a better job.

146.     The Seller Defendants also breached their fiduciary duties in connection with the retention of Argent as the ESOP Trustee. After appointing Argent to serve in this role, the Seller Defendants had an ongoing obligation to monitor Argent to ensure that it was acting in compliance with statutory standards under ERISA. *See* 29 C.F.R. § 2509.75-8 (FR-17). However, the Seller Defendants failed to do so and looked the other way when Argent approved the Transaction for a sale price that far exceeded the fair market value of the shares that were purchased.

147.     Among other things, the Seller Defendants:

  a.     failed to make sure that Argent had adequate controls over its fiduciary processes, including protections to ensure that it hired competent valuation advisors and did not unreasonably rely on flawed valuations;

b.     failed to make sure that Argent and its advisors received all material information in connection with the Transaction, including information relating to potential business risks;

c.     failed to make sure that Argent received accurate information and realistic financial projections for due diligence;

d.     failed to make sure that Argent fully considered all relevant factors with respect to the Transaction;

e.     failed to monitor Argent's fiduciary processes;

f.     failed to review and evaluate the performance of Argent, or have a system in place for doing so;

g.     failed to remove Argent when they knew that its performance was inadequate for the reasons described herein; and

h.     failed to ensure that Argent took appropriate remedial action after the Transaction.

148.    The Seller Defendants are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3), for their failure to appropriately appoint and monitor Argent as the ESOP Trustee in a manner consistent with ERISA's fiduciary standards.

### Count III
### Prohibited Transactions in Violation of ERISA § 406, 29 U.S.C. § 1106
### (Against Argent)

149.    Plaintiff incorporates the preceding paragraphs as though set forth herein, including but not limited to the preceding allegations regarding Argent's fiduciary status.

150.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), requires that a plan fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing of any property between the plan and a party in interest," or a "(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."

151.    ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), further provides that a plan fiduciary shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes the direct or indirect loan of money between the plan and a party in interest.

152.    ERISA § 3(14), 29 U.S.C. § 1002(14) defines a "party in interest" to include

- "any fiduciary … of such employee benefit plan"

- "an employer any of whose employees are covered by such plan"

- "an employee, officer, director … or a 10 percent or more shareholder" of an employer whose employees are covered by the ESOP

- "a relative (as defined in paragraph (15)) of any individual described in subparagraph (A), (B), (C), or (E)[.]"

29 U.S.C. § 1002(14)(A), (C), (H), and (F).

153.    The Seller Defendants are parties in interest to the ESOP within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14) because, *inter alia*, they were fiduciaries to the Plan; employees, officers, directors, and/or large shareholders of the Company whose employees were covered by the Plan; and relatives of Plan fiduciaries.

154.    The Company is also a party in interest to the ESOP because it is an employer whose employees are covered by the Plan.

155.    Argent, acting as the Trustee of the ESOP and a fiduciary of the ESOP, approved and caused the ESOP to purchase 400,000 shares of Company stock from the Seller Defendants, each of whom was a party in interest to the ESOP. This was a prohibited transaction because the Transaction constituted an exchange of property between the ESOP and the Seller Defendants in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), as well as a transfer of the ESOP assets to the Seller Defendants in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

156.    Thereafter, each individual payment to the Seller Defendants by the ESOP

constituted another exchange of property between the ESOP and the Seller Defendants in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), as well as a transfer of the ESOP assets to the Seller Defendants in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

157.     As Trustee, Argent also caused the ESOP to borrow over $73 million from the Seller Defendants and over $20 million from the Company, which constituted separate prohibited transactions in violation of ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B).

158.     Each payment by the ESOP of principal or interest to the Seller Defendants or to the Company in connection with these loans constitutes an independent violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

159.     Argent knew or should have known that the foregoing transactions were prohibited.

160.     The foregoing prohibited transactions are not subject to any exemptions under ERISA § 408, 29 U.S.C. § 1108.  The Seller Defendants received more than fair market value in connection with the sale of the Company and also in connection with the Seller Notes.

161.     Defendant Argent is liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3), for the prohibited transactions set forth herein.

**Count IV**
**Prohibited Transactions in Violation of ERISA § 406, 29 U.S.C. § 1106**
**(Against Seller Defendants)**

162.     Plaintiff incorporates the preceding paragraphs as though set forth herein, including but not limited to the preceding allegations regarding the Seller Defendants' status as fiduciaries and parties in interest.

163.     ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), requires that a plan fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction

constitutes a direct or indirect (A) sale or exchange, or leasing of any property between the plan and a party in interest," or a "(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."

164.    ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), further provides that a plan fiduciary shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes the direct or indirect loan of money between the plan and a party in interest.

165.    The ESOP's purchase of 400,000 shares of WBBQ common stock from the Seller Defendants constituted a direct or indirect exchange of property between the ESOP and parties in interest in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), as well as a transfer of ESOP assets to the Seller Defendants in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

166.    Thereafter, each individual payment to the Seller Defendants by the ESOP constituted another indirect exchange of property between the ESOP and the Seller Defendants in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), as well as a transfer of the ESOP assets to the Seller Defendants in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

167.    The Seller Notes and Company Loan constituted separate prohibited transactions in violation of ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B).

168.    Each payment by the ESOP of principal or interest to the Seller Defendants or to the Company in connection with these loans constitutes an independent violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).[7]

---

[7] Additionally, ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3) prohibits a plan fiduciary from receiving "any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." Based on information and belief, Liquid Subsidiary, LLC is owned by the Seller Defendants and was formed to receive the principal

169.     The Seller Defendants knew or should have known that the foregoing transactions were prohibited.

170.     These foregoing prohibited transactions are not subject to any exemptions under ERISA § 408, 29 U.S.C. § 1108.  The Seller Defendants received more than fair market value in connection with the sale of the Company and also in connection with the Seller Notes.

171.     Because the Seller Defendants breached their fiduciary duties in failing to monitor Argent's actions during the relevant period (see Count II above) each of them caused the numerous prohibited transactions alleged in this Count, and are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), in connection with those prohibited transactions.

172.     Alternatively, if the Seller Defendants are not found to be fiduciaries who caused the prohibited transactions alleged in this Count, they are still liable for equitable relief under *Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000) because each of them knowingly participated in the prohibited transactions and Argent's fiduciary breaches as described herein.

- As owners and leaders of the Company, the Seller Defendants were involved in and directed the preparation of the financial projections underlying the stock appraisal relied upon by Argent which was the basis of the purchase price the ESOP paid for the Company.

- Given their role in the preparation of the Company's financial statements and its operations for many years, the Seller Defendants knew that the financial and business projections underlying the stock valuation were unrealistic and unreliable and that the purchase price exceeded the fair market value of the Company.

---

and interest payments on the refinanced Seller Notes for the Seller Defendants. Thus, the Seller Defendants—fiduciaries with respect to the ESOP—received consideration for their personal account for a party dealing with such plan in connection with a transaction involving the assets of the plan in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

- The Seller Defendants knew that the Company faced idiosyncratic risks because of its geographic concentration, the cost pressures it was facing, and the necessity of low prices for its strategic success;

- The Seller Defendants knew that, despite selling 80% of the Company's shares outstanding to the ESOP, they retained control over the Company due to their ability to appoint proxies to vote those shares through the Investment Committee, and their ability to remove and Argent as Trustee without cause;

- The Seller Defendants knew that they retained the power to acquire additional shares and dilute the ESOP's stake in the Company to as little as 40%;

- The Seller Defendants knew that the Transaction was highly leveraged, and the Company bore all risk of default in connection with the underlying loans.

- The Seller Defendants knew that the Company was obligated to make contributions to the ESOP in an amount sufficient to cover the principal and interest payments on the loans, which functioned as a significant drag on its working capital;

- The Seller Defendants knew that the interest rate on the Seller Notes exceeded the interest rate on the Company loan at the time of the Transaction, and knowingly participated in all loan payments that were made to them under the Seller Notes.[8]

- Based on their knowledge, position, and unique access to the Company's financial and business information, the Seller Defendants knew that Argent had no basis for approving the Transaction or the continuing payments to the Seller Defendants, but participated in the Transaction and accepted those continuing payments anyway in conscious disregard of the ERISA violations described herein.

173.    Accordingly, the Seller Defendants are liable as non-fiduciary parties in interest for

disgorgement and other appropriate equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

**Count V**
**Co-Fiduciary Liability Under ERISA § 405(a), 29 U.S.C. §§ 1105(a)**
**(Against Seller Defendants)**

174.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

175.    ERISA § 405(a), 29 U.S.C. § 1105(a) provides that a fiduciary "with respect to a

---

[8] The Seller Defendants also knew the terms of the loan refinancing through Liquid Subsidiary, knew that they held an ownership stake in Liquid Subsidiary, and knowingly received payments for their benefit through Liquid Subsidiary in connection with the refinanced loan.

plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan … if he participates knowingly in … an act or omission of such other fiduciary; … or [] he has knowledge …of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

176. As discussed above, the Seller Defendants had knowledge of Argent's fiduciary breaches and the prohibited transactions set forth herein, and knowingly participated in and facilitated those prohibited transactions. *See supra* at ¶ 172.

177. The Seller Defendants made no effort, much less reasonable efforts, to remedy those fiduciary breaches and prohibited transactions.

178. Based on the foregoing, the Seller Defendants are liable as co-fiduciaries under ERISA § 405(a), 29 U.S.C. § 1105(a), for Argent's fiduciary breaches and other ERISA violations, and subject to appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3).

## Count VI
### Liability Under ERISA § 410(a), 29 U.S.C. § 1110(a)
### (Against Seller Defendants and Argent)

179. Plaintiff incorporates the preceding paragraphs as though set forth herein.

180. ERISA § 410(a), 29 U.S.C. § 1110(a) provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy."

181. Indemnification agreements requiring a company owned by an ESOP to indemnify the ESOP fiduciaries are prohibited as they "would have the same result as an exculpatory clause, in that it would, in effect, relieve the fiduciary of responsibility and liability to the plan by

abrogating the plan's right to recovery from the fiduciary for breaches of fiduciary obligations." 29 C.F.R. § 2509.75-4.

182.     The Company's Articles of Incorporated provide that, "[t]he Corporation shall have the power to indemnify any person who was or is a party or is threatened to be made a party to, or testifies in, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative in nature, by reason of the fact that such person is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding to the full extent permitted by law, and the Corporation may adopt bylaws or enter into agreements with any such person for the purpose of providing for such indemnification."

183.     This provision is void under ERISA § 410(a), 29 U.S.C. § 1110(a), as applied to any liability in this case.

184.     Defendant Argent is fiduciary to the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

185.     The Seller Defendants are fiduciaries to the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

186.     If the indemnification provision set forth above were exercised to indemnify Defendants for the ERISA violations alleged in this case, it would abrogate the ESOP's right to recovery from a breaching fiduciary and effectively require the ESOP to bear the cost of liability itself.

187.    Plaintiff seeks appropriate relief under ERISA §§ 502(a)(2) and/or 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and/or 1132(a)(3), to enjoin Defendants from relying on this indemnification provision in connection with any liability or costs of defense in this case.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the class, prays that judgment be entered against Defendants on each Count and that the Court grant all available relief to address the ERISA violations referenced herein, including (among other things):

A.    Declaring that Argent and the Seller Defendants have each breached their fiduciary duties under ERISA;

B.    Enjoining Argent and the Seller Defendants from further violations of their fiduciary responsibilities, obligations, and duties;

C.    Removing Argent as the Trustee of the WBBQ ESOP and barring it from serving as a fiduciary of the ESOP in the future;

D.    Appointing a new independent fiduciary to manage the WBBQ ESOP and ordering the costs of such independent fiduciary be paid for by Defendants;

E.    Ordering each fiduciary found to have violated ERISA to restore all losses resulting from their fiduciary breaches and to disgorge all profits made through use of assets of the ESOP;

F.    Ordering that Defendants provide other appropriate equitable relief to the ESOP, including but not limited to providing an accounting for profits, ordering surcharge against Defendants to restore losses to the ESOP, rescinding or reforming the Transaction, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by any of the Defendants;

G.    Enjoining Defendants from seeking indemnification or exculpation from WBBQ or the WBBQ ESOP for their violations of ERISA;

H.    Enjoining the Seller Defendants from dissipating any of the proceeds they received from the Transaction held in their actual or constructive possession until the ESOP participants' rights can be adjudicated;

I.    Enjoining the Seller Defendants from transferring or disposing of any of the proceeds they received from the Transaction to any person or entity, which would prejudice, frustrate, or impair the ESOP participants' ability to recover the same;

J.      Requiring Defendants to pay attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or ordering payment of fees and expenses to Plaintiff's counsel on the basis of the common benefit or common fund doctrine out of any money recovered for the class;

K.      Awarding pre-judgment interest and post-judgment interest; and

L.      Awarding such other and further relief that the Court determines to be appropriate pursuant to ERISA § 502(a)(2) and/or § 502(a)(3), 29 U.S.C. § 1132(a)(2) and/or 1132(a)(3), or pursuant to Rule 54(c) of the Federal Rules of Civil Procedure, or that is otherwise equitable and just.

May 20, 2022                                   Respectfully submitted,

                                               _____
                                               Michael Eisenkraft (ME-6974)
                                               **Cohen Milstein Sellers & Toll PLLC**
                                               88 Pine Street
                                               14th Floor
                                               New York, New York 10005
                                               Tel: (212) 838-7797
                                               Fax: (212) 838-7745
                                               meisenkraft@cohenmilstein.com


                                               Michelle C. Yau (*Pro Hac Vice* forthcoming)
                                               Kai H. Richter (*Pro Hac Vice* forthcoming)
                                               Daniel R. Sutter (*Pro Hac Vice* forthcoming)
                                               Ryan A. Wheeler (*Pro Hac Vice* forthcoming)
                                               **Cohen Milstein Sellers & Toll PLLC**
                                               1100 New York Ave. NW ● Fifth Floor
                                               Washington, DC 20005
                                               Tel: (202) 408-4600
                                               Fax: (202) 408-4699
                                               myau@cohenmilstein.com
                                               krichter@cohenmilstein.com
                                               dsutter@cohenmilstein.com
                                               rwheeler@cohenmilstein.com